IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PRIVATE WEALTH ADVISORS, INC.,    )
    )
    Plaintiff,    )
    )    Civil Action No.
    v.    )
    )    *ELECTRONICALLY FILED*
STUART M. MILLER, DANIEL P.    )
MCCURRY and MILLER MCCURRY LLC,    )
    )
    Defendants.    )

## **VERIFIED COMPLAINT**

Private Wealth Advisors, Inc. ("PWA"), by and through its undersigned counsel, files this Verified Complaint against its former principal and board member, Stuart M. Miller ("Miller"), its former employee, Daniel McCurry ("McCurry"), and the company they founded to unlawfully compete with PWA, Miller McCurry, LLC ("Miller McCurry") in violation of their contractual and other legal obligations to PWA.

As a Principal and Board Member, Miller was heavily involved in managing PWA's business, as well as responsible for the personal financial planning and asset management of a portfolio of some of PWA's most valuable clients.  Similarly, McCurry was also responsible for providing personalized wealth management services to established PWA clients, all of whom originated from PWA.  These roles provided Miller and McCurry with access to PWA's most valuable customer relationships and its confidential and proprietary information, including information regarding its clients, prospective clients, investment strategies, assets under management, key contacts, business and marketing plans and strategies, profit margins, and pricing, among other things.

Now, with PWA's confidential, proprietary information, Miller and McCurry are actively and directly competing with PWA and soliciting PWA's clients in violation of the express provisions of their employment agreements, true and correct copies of which are attached as Exhibits A and B respectively.

A.    **<u>Introduction</u>**

1.    PWA brings this action to protect its client relationships, goodwill, valuable confidential, proprietary and/or trade secret information, enforce its former employees' contractual obligations regarding competitive activity, prevent them from using this confidential, proprietary and/or trade secret information on behalf of the competing business they established, and prohibit them from unfairly competing with PWA.

2.    PWA is a leading provider of fee-based wealth management services in the highly competitive fee-based wealth management industry with offices in Greensburg, Pennsylvania and Pittsburgh, Pennsylvania.

3.    PWA's business is based on the customer relationships it develops, fosters and assigns to its financial advisors, such as Miller and McCurry.

4.    Miller was a founding member, Board Member and Principal of PWA and McCurry was employed by PWA as a wealth advisor.

5.    In that role, both Miller and McCurry had access to PWA's most valuable client relationships and its confidential and proprietary information and trade secrets, including information regarding its clients, prospective clients, investment strategies, assets under management, key contacts, business and marketing plans and strategies, profit margins, and pricing (hereinafter collectively referred to as the "Confidential Information and Trade Secrets").

6.    Without notice, Miller and McCurry (a) resigned from their employment with PWA on August 23, 2019 using identical resignation letters; (b) went to work for Miller

McCurry, a competing business they had set up during their employment with PWA; and (c) began soliciting PWA's clients in violation of their contractual and legal obligations to PWA.

7.      If left unstopped, Miller and McCurry will continue to use PWA's Confidential Information and Trade Secrets and its considerable goodwill for the benefit of themselves and Miller McCurry, thereby enabling them to unfairly compete with PWA.

8.      PWA will suffer immediate and irreparable harm if Miller and McCurry's violations of their contractual obligations are not immediately enjoined.

**B.      Parties**

9.      Private Wealth Advisors, Inc., a Pennsylvania corporation, is headquartered in Greensburg, Pennsylvania.

10.      Stuart M. Miller is an adult individual who, upon information and belief, resides at 480 Fairview Road, Pittsburgh, PA 15238.

11.      Daniel P. McCurry is an adult individual who, upon information and belief, resides at 118 Vista Ridge Lane, Valencia, PA 16059.

12.      Miller McCurry, LLC, upon information and belief, is a Pennsylvania limited liability company, located at 106 Isabella Street, Suite 304, Pittsburgh, PA 15212.  Upon information and belief, Miller and McCurry are the sole members of Miller McCurry.

**C.      Jurisdiction and Venue**

13.      This Court has jurisdiction over this civil action under 28 U.S.C. § 1331 because the case arises, in part, under the federal Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq.*

14.      This Court has supplemental jurisdiction over the state law claims in this action under 28 U.S.C. § 1367 because such claims are so closely related to the Defend Trade Secrets Act claim that they are part of the same case and controversy.

15.     This Court has personal jurisdiction over Miller and McCurry because they have the required minimum contacts with this forum to establish personal jurisdiction.  The Individual Defendants (a) reside in, are citizens of, and are domiciled in or around Pittsburgh, Pennsylvania; (b) were engaged to perform services for PWA in Pittsburgh, Pennsylvania and the surrounding areas; (c) are engaged by Miller McCurry in Pittsburgh, Pennsylvania; (d) improperly solicited and are soliciting PWA's clients and prospective clients in Pittsburgh, Pennsylvania and the surrounding areas; (e) unlawfully conspired to breach their contractual obligations to PWA in Pittsburgh, Pennsylvania and (f) have used and are using PWA's Confidential Information and Trade Secrets on behalf of Miller McCurry in Pittsburgh, Pennsylvania.

16.     This Court has personal jurisdiction over Miller McCurry because Miller McCurry is headquartered in Pittsburgh, Pennsylvania and its members, Miller and McCurry reside in Western Pennsylvania.  Furthermore, Miller McCurry has the required minimum contacts with this forum to establish personal jurisdiction.  Miller McCurry (a) is registered to do business in Pennsylvania; (b) is headquartered in Pittsburgh, Pennsylvania; (c) misappropriated PWA's Confidential Information and Trade Secrets in Pennsylvania; (e) tortiously interfered with PWA's contractual obligations with Miller and McCurry in Pennsylvania and (f) tortiously interfered with PWA's business relationships with its clients in Pennsylvania.

17.     Based on Defendants' contacts as described in Paragraphs 15 and 16, it was wholly foreseeable that they would be haled into court in the United States District Court for the Western District of Pennsylvania.

18.     Venue is proper in the United States District Court for the Western District of Pennsylvania under 28 U.S.C. § 1391 because: (a) Miller and McCurry reside in, are citizens of and are domiciled in Western Pennsylvania; (b) this Court has personal jurisdiction over all

parties; and (c) a substantial portion of the events giving rise to the claims asserted in this action occurred in this judicial district.

**D.**   **PWA's Business**

19.     Headquartered in Greensburg, Pennsylvania, PWA is a leading provider of fee-based wealth management services, supervising more than $800 million in assets and services over 1,100 clients.

20.     The wealth management industry is a highly competitive marketplace with many firms vying for the same high net worth clients.

21.     PWA and Miller McCurry, both of which provide fee-based wealth management services, are direct competitors.

22.     PWA provides customized investment strategies and plans for its clients based on the financial needs and goals of the client.

23.     Because this requires PWA to have an intimate knowledge of its clients' unique circumstances, objectives, risk tolerance and future aspirations, PWA invests significant resources in developing and fostering these relationships through its advisors.

24.     PWA, like its competitors, focuses much of its business development efforts through a dedicated group of advisors, who are assigned to specified PWA accounts.  PWA's advisors, like others in the industry, grow PWA's portfolio in a variety of ways, but most importantly, through relationship building with PWA's clients and prospective clients. These relationships, built over time, are often the most important factor in selecting a financial advisor, as clients come to rely upon the advisor as their point of contact and the "face" of the company.

25.     PWA relies on its advisors to be its contact with its clients for all of their wealth management and investment needs.

26.     Advisors are privy to a vast amount of Confidential Information and Trade Secrets regarding PWA's clients, including the identity of PWA's clients, their contact information, financial goals, account balances, assets under management, transactional history, risk tolerance, portfolio and investment strategies.  Such information could be easily exploited by a competitor if the competitor was permitted to gain access to such information by hiring even one of PWA's advisors and using it to solicit PWA's clients.

27.     In addition to the Confidential Information and Trade Secrets regarding PWA's clients with which PWA's advisors are entrusted, PWA also entrusts its advisors with Confidential Information and Trade Secrets relating to its business, including information regarding potential clients, pricing, assets under management, products, services, investment strategies, profit margins, sales, sales volumes, unique client needs and goals, etc.

28.     As such, PWA places a great deal of trust in its advisors by entrusting them with a vital company asset – its relationships with its clients.

29.     PWA expends a great deal of money through the salaries and incentive compensation of its advisors to build strong client relationships between PWA and its clients.  It further supports its advisors and their efforts to build strong relationships by providing administrative support, reimbursement of business-related expenses, and the strength and recognition of the PWA name.

**E.      Miller Helps to Establish and Found PWA**

30.     In 2003, Miller, Joseph A. Scarpo ("Scarpo") and John M. Schneider ("Schneider") formed PWA and began operating as a separate entity.

31.     In 2006, Miller, Scarpo and Schneider developed a transition plan for Miller by which Scarpo and Schneider agreed to buy Miller out of the entity.

32.     Scarpo and Schneider agreed to buy Miller out of the entity pursuant to the terms of a Buy-Out Agreement, in which Scarpo and Schneider agreed to pay Miller for his portfolio of specifically identified clients.

33.     Scarpo and Schneider paid Miller approximately $4,000,000 for his portfolio of clients.

34.     In connection with the buy-out, PWA agreed it would continue to employ Miller pursuant to the terms of an Employment Agreement.

35.     Miller initially indicated he wanted to continuing working through 2015, at which point he would retire.  As result, the Employment Agreement had an expiration date of December 31, 2015.

36.     Specifically, Miller would continue working for PWA through December 31, 2015, at which point he would retire and transition his clients to other PWA representatives.

37.     Miller, however, did not retire on December 31, 2015; rather, he continued to be employed pursuant to the terms and conditions set forth in the Employment Agreement through August 23, 2019.

38.     Specifically, PWA continued to pay Miller an annual base salary of $300,000 per year as set forth in the Employment Agreement through August 23, 2019.  *See* Ex. A, Section 3(a).  In fact, although the Agreement provided for a reduction in Miller's annual base salary, PWA maintained his annual base salary of $300,000 through his resignation on August 23, 2019.

39.      PWA also continued to pay Miller an annual bonus calculated based on the combined revenue increase generated by the Miller/McCurry team over the base year revenue determined as of September 31, 2015. *See* Ex. A, Section 3(b).

40.     PWA continued to provide Miller with fringe benefits as set forth in Section 4 of the Employment Agreement through his resignation on August 23, 2019.  *See* Ex. A, Section 4.

41.     PWA continued to reimburse Miller for all reasonable business and professional expenses as set forth in Section 5 of the Employment Agreement through his resignation on August 23, 2019.  *See* Ex. A, Section 5.

42.      PWA continued to provide Miller with facilities, equipment, services and supplies as set forth in Section 6 of the Employment Agreement through his resignation on August 23, 2019 and, in fact, signed a long term lease for space in Oxford Centre in Pittsburgh on August 23, 2018, which they took possession on February 1, 2019, for Miller and McCurry to work from.  *See* Ex. A, Section 6.

43.     The parties made no attempts to renegotiate the Employment Agreement upon its expiration and neither PWA nor Miller indicated that it or he no longer wished to be bound by the terms of the Employment Agreement.

44.     In that regard, PWA and Miller's course of conduct renewed the Employment Agreement, such that it was in effect at the time of Miller's resignation.

45.     In addition to his role as a Principal and Founder, Miller also continued to be a member of PWA's board of directors through his resignation on August 23, 2019 and, in fact, continues to be a member of PWA's board of directors.

46.     While employed by PWA, Miller gained valuable knowledge and experience in the wealth management industry through training and support provided by PWA and was paid to develop and foster client relationships on behalf of PWA.

47.     While working under the employment agreement, Miller continued to service the approximately 100 valuable clients, including many in the Pittsburgh region, that PWA had paid him for as part of the Buy-Out Agreement.

48.     In addition to the pre-existing clients, Miller was also expected to develop new clients on behalf of PWA and at PWA's expense.

49.     Although Miller had been compensated for his portfolio of clients as part of the 2005 buy out, PWA continued to pay Miller for the work he performed on those clients through the date of his resignation.

50.     At the time of his abrupt resignation, Miller was assigned and the Miller/McCurry team managed approximately 101 clients, totaling approximately $196 million in assets under management.

51.     As a Principal and Founding Partner of PWA and a member of its board of directors (and throughout his employment with PWA), Miller was entrusted with PWA's Confidential Information and Trade Secrets.

52.     Miller was well-compensated for his role as an executive for PWA and, as of the time of his resignation, was PWA's highest paid employee.  Since 2006, Miller's total compensation from PWA has exceeded $300,000 annually.

**F.     PWA Employs McCurry to Service the Clients it Purchased from Miller**

53.     PWA hired McCurry in 2005 to, among other things, work with Miller to service the clients it had purchased from Miller and to develop and manage new clients on behalf of PWA.

54.     Although nearly all of McCurry's accounts were pre-existing PWA clients, McCurry was also expected to develop new clients on behalf of PWA and at PWA's expense.

55.     At the time of his abrupt resignation, McCurry, as part of the McCurry/Miller team, managed approximately 55 clients, totaling approximately $42 million in assets under management.

56.     As an advisor for PWA, McCurry was entrusted with PWA's Confidential Information and Trade Secrets.

57.      McCurry was well-compensated for his role at PWA, earning over $140,000 in 2016, $152,000 in 2017 and $176,000 in 2018.

**G.     Miller and McCurry's Contractual Obligations to PWA**

58.     To protect its valuable investment in its customer relationships and Confidential Information and Trade Secrets, PWA required Miller and McCurry to execute employment agreements during their respective employments with PWA.

59.     As part of the Buy Out Agreement in which Miller was paid approximately $4,000,000 for his portfolio of clients, PWA and Miller agreed to the terms of an employment agreement, in which PWA promised to pay Miller specified compensation (including bonuses) and Miller, among other things, agreed to be bound by certain restrictions both during and upon termination of his employment with PWA.

60.     In Section 11 of the Employment Agreement, Miller agreed as follows:

> During the term of this Contract, Employee shall not at any time or place or to any extent whatsoever, either directly or indirectly, without the express prior written consent of the Corporation, engage in any business or in any activity competitive with or adverse to the business, practice or affairs of Corporation unless such activity is disclosed to and permitted in writing by Corporation.  Activities adverse to the business, practice or affairs of Corporation shall include but not be limited to, the copying of client files or address lists, the establishment of a separate office or arrangements to do this in the future, and the solicitation of any client or entity doing business with Corporation…

Ex. A, Section 11.

10

61.     Upon termination of his employment (regardless of reason), Miller agreed that he would not "directly or indirectly engage in any business or in any activity competitive with or adverse to the business, practice or affairs of [PWA] during the twenty four (24) month period following termination and within twenty (20) miles of any office of [PWA], without [PWA]'s express written consent" ("Miller's Non-Compete"). Ex. A, Section 16.

62.     Miller further agreed that Miller's Non-Compete was one of the "essential elements" of the employment agreement and that "but for the agreement of [Miller] to comply with such covenants, [PWA] would not have agreed to enter into [the employment agreement." Ex. A, Section 16.

63.     Miller agreed that "damages for violation of [Miller's Non-Compete] cannot be adequately determined and that such covenants may, therefore, be specifically enforced by equitable injunction and temporary restraining order…" Ex. A, Section 16.

64.     In addition to injunctive relief, Miller agreed he would pay PWA a liquidated damage for his violation of Miller's Non-Compete equal to the "Additional Bonus" of $2,250,000 that he received under his employment agreement. Ex. A, Section 16.

65.     Like Miller, McCurry also agreed to be bound by the terms of an employment agreement during his employment with PWA.

66.     In that regard, McCurry acknowledged and agreed:

   a. That [PWA] has made a substantial financial investment in acquiring its client base;

   b. That, during the course of [his] employment with [PWA], [he has] come to possess and will help [PWA] develop valuable proprietary information, trade secrets and other confidential information belonging to [PWA] and may be instrumental to the development and/or maintenance of good will with [PWA's] clients;  and

     c.   That such proprietary information, trade secrets, confidential information and goodwill are valuable assets of [PWA] and [PWA] has a legitimate business interest in protecting itself from disclosure or misappropriation of such information and from interference with its goodwill relationships with its clients.

Ex. B, Section 1.

    67.    In exchange for continued at-will employment and an additional bonus payment of $5,000 that he would not have received but for his execution of the employment agreement, McCurry executed an Employment Agreement in May 2012.  McCurry acknowledged the receipt of this additional bonus that he received as consideration for signing the Employment Agreement:

> This Employment Agreement is a precise duplicate and will serve as a replacement of the original Employment Agreement that I signed in May 2012. By signing, I acknowledge that I had accepted compensation in the amount of $5,000 dollars in my 5/30/2012 paycheck in exchange for signing the original Employment Agreement.  Documentation demonstrating the compensation I received is attached.

**Private Wealth Advisors, Inc.**

By: John Schneider

Its: President

Employee

Name: Daniel McCurry

    68.    In the Employment Agreement, McCurry agreed as follows:

> During the term of my employment with the Company and thereafter, I shall not, directly or indirectly, divulge, furnish or

make accessible to any other person, business, firm or corporation, or use in any way other than in the ordinary course or for the benefit of the business of the Company any Confidential Information, as defined herein, of the Company which I have acquired or become acquainted with or will acquire or become acquainted with as a result of my employment with the Company, whether developed by me or by others.

The Confidential Information is the property of the Company and I acknowledge that the use, misappropriation or disclosure of the Confidential Information would constitute a breach of trust and fiduciary duty and could cause irreparable injury to the Company. Furthermore, I acknowledge and agree that during the course of my employment with the Company, I may be exposed to the confidential information of clients and other third parties and I will maintain the confidentiality of this information and will only use it as necessary to carry out the work for the Company consistent with the Company's arrangement with these clients and third parties…

Ex. B, Section 3.

69.     McCurry further agreed that he would "keep and maintain adequate and current written records of all Confidential Information made by [him] … during the term of employment (the 'Records')" and that he would not "remove such Records from [PWA's] place of business except as expressly permitted by PWA policy…"  Ex. B, Section 4.

70.     McCurry also agreed that, "at the time of termination of employment for any reason or no reason at all, [he would] deliver to [PWA] any and all Records and Confidential Information, and any reproductions of the same, in [his] possession."  Ex. B, Section 5.

71.     To protect its investment in its clients, its Confidential Information and Trade Secrets and its competitive advantage, PWA also required McCurry to agree to post-employment restrictions.

72.      Specifically, McCurry agreed as follows:

I agree not to directly or indirectly solicit, for the purpose of offering or attempting to offer any service, product or other application which is the same or similar to the services, products or other applications offered by the Company or in the process of

13

being developed by the Company within the last year prior to termination of my employment with the Company, any of the Company's clients for a period of two (2) years after termination of my employment with the Company.  I further agree, for a period of two (2) years after the termination of my employment with the Company, that I will not directly or indirectly hire or directly or indirectly solicit or attempt to solicit any employee of, consultant to, the Company, which employee or consultant has been rendering services to the Company at any time within the twelve (12) month period immediately preceding the termination of my employment, to leave the employ of, or no longer render service to or for the benefit of, the Company.

Ex. B, Section 6. ("McCurry's Non-Solicit").

73.     McCurry also agreed that, during the term of his employment with the Company and for a period of two (2) years thereafter, he would not:

a.   Provide services directly or indirectly to any client or prospective client of [PWA];

b.   Anywhere within fifty (50) miles of any office of [PWA], become an officer or director of, or consultant to or be employed by, or otherwise render services to or on behalf of, a Competing Business, which is defined to include any person, corporation, partnership, joint venture, association, or other entity engaged in the business:

(i)      Financial investment management;

(ii)     Real estate development; or

(iii)    Offering or attempting to offer any service, product or other application which is the same as or similar to the services, products or other applications offered or in the process of being developed by the Company within the last year prior to termination of my employment Company.

Ex. B, Section 7. ("McCurry's Non-Compete").

74.     McCurry further acknowledged and agreed that, if he were to violate either McCurry's Non-Solicit or McCurry's Non-Compete, such violation would result in "immediate and irreparable harm" to PWA and that PWA would be entitled to "an injunction or a decree of

specific performance from a court of equity in addition to other rights or remedies" PWA may have in law or in equity.  Ex. B, Section 11.

75.    McCurry further agreed to reimburse PWA for all costs, including reasonable attorneys' fees, associated with obtaining relief under the employment agreement.

76.    The Employment Agreements executed by Miller and McCurry are valid and enforceable contracts and the post-employment restrictions on competition and solicitation contained therein are fair, reasonable and necessary to protect the legitimate business interests of PWA.  Those business interests are proprietary and establish a competitive advantage in favor of PWA.

## H.    Miller and McCurry Abruptly Resign From PWA

77.    On August 23, 2019, Miller and McCurry traveled separately to PWA's Greensburg office to meet with Scarpo.  When they arrived at the office, both feigned surprise to see the other despite the fact that they were fully aware that they were going to deliver their identically scripted resignations.

78.    While McCurry sat quietly at the table, Miller delivered on behalf of McCurry the following resignation letter dated August 23, 2019 at approximately 11:00 a.m.:

August 23, 2019

VIA HAND DELIVERY
Private Wealth Advisors, Inc. (Former RIA)
542 Rugh Street
Greensburg, PA  15601

To Whom it May Concern:

This letter serves as formal notification of my resignation from Private Wealth Advisors, Inc., effective immediately.  While my association with Private Wealth Advisors, Inc. was an enjoyable and productive one, I have decided that my professional goals will be best served by another firm. Accordingly, I will expect my registration with Private Wealth Advisors, Inc. to terminate on the above date and a copy of the U-5 form to be delivered to me in a timely manner.

Daniel P. McCurry

79.     Simultaneously, Miller delivered the following resignation letter dated August 23,

2019:

August 23, 2019

VIA HAND DELIVERY
Private Wealth Advisors, Inc. (Former RIA)
542 Rugh Street
Greensburg, PA  15601

To Whom it May Concern:

This letter serves as formal notification of my resignation from Private Wealth Advisors, Inc., effective immediately.  While my association with Private Wealth Advisors, Inc. was an enjoyable and productive one, I have decided that my professional goals will be best served by another firm. Accordingly, I will expect my registration with Private Wealth Advisors, Inc. to terminate on the above date and a copy of the U-5 form to be delivered to me in a timely manner.

Stuart M. Miller

80.     Apparently recognizing that he was about to illegally steal the very clients that PWA had already purchased from him and compete with PWA in violation of his legal obligations to PWA, Miller also proposed an Asset Purchase Agreement, Bill of Sale and Assignment and Assumption Agreement, in which he would purchase PWA's clients for $750,000 in equal installments over a three-year period:

August 23, 2019

Private Wealth Advisors, Inc.
542 Rugh St.
Greensburg, PA 15601

RE: **Asset Purchase**

To whom it may concern:

Enclosed for your review and consideration is my proposed Asset Purchase Agreement, Bill of Sale and Assignment and Assumption Agreement (the "Agreements") which memorialize my offer to purchase my book of business and all of the related assets thereto from Private Wealth Advisors, Inc.  Certain information, including the schedules to the agreement, have been intentionally omitted until the schedules and other information can be mutually agreed upon by the parties to the Agreements.

The proposed offer to purchase shall terminate on September 23, 2019, if not accepted by that date, and thereafter all proposed Agreements shall be null and void.

Sincerely,

Stuart M. Miller

*See* Miller McCurry Resignation Paperwork attached as Exhibit C.

81.     The day of their abrupt and scripted resignations, Miller and McCurry sent a targeted solicitation to all of the PWA clients that had been assigned to them advising them of their new firm, Miller McCurry and the competitive services they offer.

82.     Upon information and belief, Miller and McCurry used PWA Confidential Information and Trade Secrets to mail their solicitation to the specific customers they had been servicing at PWA.

83.     Upon information and belief, Miller and McCurry informed PWA clients of their intended move and new company prior to their resignations from PWA.

**I.      Miller and McCurry Breach Their Legal Obligations to PWA**

84.     Miller and McCurry began planning their departure from PWA months before their resignation.

85.     Specifically, prior to their resignations and while being paid by PWA, they had set up Miller McCurry as a legal entity, leased office space less than a mile away from their PWA Pittsburgh office, sought legal advice on how to get out of or around their contractual obligations to PWA, had legal documents drafted to propose an asset purchase to PWA, sought the services of a computer forensic vendor for consultation related to their electronic activities, gathered the addresses and other information of the PWA clients they serviced so that they could mail them their solicitation, set up email accounts for Miller McCurry and met with key clients to advise them of their impending departure.

86.     Despite their well-planned departure, Miller and McCurry did not return their laptops or PWA-issued phones upon resignation; rather, PWA had to send a representative to their homes to retrieve the electronic devices.

87.     A forensic evaluation of those computers revealed that Miller and/or McCurry used removable storage devices and even a removable hard drive on their PWA devices in the months prior to their resignation.

88.     Shortly before their resignations, Miller and McCurry also began directing clients to use their personal email addresses instead of their PWA email accounts to avoid detection.

89.     Upon information and belief, Miller and McCurry had the contents of their iPhones transferred to new devices, including PWA client information.

90.     Upon information and belief, Miller McCurry sent a targeted solicitation to Miller and McCurry's most significant PWA clients in terms of assets under management using PWA's confidential client information either before they resigned or immediately after their resignations.

91.     By Monday, August 26, 2019, Miller and McCurry were actively competing with PWA and soliciting PWA clients.

92.     For example, on the Monday following their resignations, a PWA client attempted to respond to contact McCurry about the targeted Miller McCurry solicitation they had received:

-----Original Message-----
From: Dan McCurry [mailto:dmccurry@millermccurry.com]
Sent: Monday, August 26, 2019 3:10 PM
To: ███████████████████████ McCurry, Daniel <dmccurry@pwausa.com>
███████████████████████
Subject: RE: Dan - Have you left PWA?

████,

You can call my cell phone and I can explain everything.  724-831-9006.

It's all good though.

Danny

Daniel P. McCurry, CFP®



106 Isabella Street, Suite 304
Pittsburgh, PA 15212
412.855.2927
DMcCurry@MillerMcCurry.com

Advisory services offered through Commonwealth Financial Network®, a Registered Investment Adviser.


-----Original Message-----

████████████████████████

Sent: Monday, August 26, 2019 3:02 PM
To: Dan McCurry <dmccurry@pwausa.com>; Dan McCurry <dmccurry@millermccurry.com>
████████████████████████

Subject: Dan - Have you left PWA?

Dan,

I got Stuart's letter about a new firm (which doesn't mention you except your email). Do you no longer work for PWA?  Have you taken our (████ and my and my Dad's) accounts with you? We hope you'll keep managing our accounts (assuming your philosophy isn't changing drastically)...

Please tell me what's going on and how this impacts our accounts.

We don't want to lose you.

████

93.    Miller and McCurry used and continue to use PWA confidential client information to solicit PWA clients.

94.    On August 29, 2019, PWA (through its counsel) sent the Defendants a cease and desist letter, in which it provided Miller and McCurry with copies of their respective employment agreements.

95.    Thereafter, Defendants continued to compete directly with PWA and solicit PWA clients in violation of Miller and McCurry's contractual obligations to PWA.

96.    For example, Miller met with one PWA client on August 30, 2019 and another on September 5, 2019.

97.    Likewise, McCurry met with a PWA client the week of September 1, 2019.

98.    Furthermore, Miller and McCurry are directing PWA clients to take certain actions with respect to their investment portfolios and the clients are contacting PWA with questions about the advice that Miller and McCurry are not authorized to be providing.

99.    For example, on or about September 6, 2019, a PWA client contacted PWA with questions about McCurry's advice to destroy a check from a non-US bank.

100.    Armed with PWA's valuable client relationships and Confidential Information and Trade Secrets, including without limitation regarding PWA's clients' financial goals, risk tolerance, portfolio and investment strategies, Miller and McCurry are now actively competing with PWA and soliciting PWA's clients on behalf of Miller McCurry, PWA's direct competitor.

101.    In fact, PWA has already lost more than ten clients due to Defendants' unlawful conduct and is continuing to lose other clients.

## J.    PWA Is Entitled To Preliminary And Injunctive Relief

102.    PWA seeks immediate relief in the form of a temporary restraining order against Defendants to (a) require the return of PWA's Confidential Information and Trade Secrets; (b) stop Defendants from using PWA's Confidential Information and Trade Secrets on behalf of a competitor; (c) stop them from using such Confidential Information and Trade Secrets to solicit PWA clients in violation of their statutory obligations to PWA; (d) stop Miller and McCurry from soliciting PWA clients in violation of their contractual obligations to PWA; (e) stop Miller and McCurry from competing with PWA in violation of their contractual obligations to PWA; (f) stop Defendants from interfering with PWA's contractual relations with Miller and/or McCurry; and (g) stop Defendants from interfering with PWA's business relations with its clients.

103.    PWA is likely to succeed on the merits of this case because it has valid and enforceable agreements with Miller and McCurry, it has legitimate business interests to protect, and Miller and McCurry's breaches of their contractual obligations to PWA are open, blatant and obvious.

104.    PWA's client relationships, goodwill, market share, business opportunities, competitive advantage, Confidential Information and Trade Secrets, and relations with its remaining employees will be irreparably harmed if a preliminary and permanent injunction is not entered.

105.     PWA will suffer far greater harm if a preliminary and permanent injunction is not granted than Defendants will suffer if one is granted.  Defendants will suffer no harm – but simply be ordered to honor the promises they made.

106.     Granting a temporary restraining order, including a preliminary injunction, would serve the public interest.

**COUNT I**
**VIOLATION OF THE DEFEND TRADE SECRETS ACT**
**PWA v. All Defendants**

107.     PWA incorporates by reference Paragraphs 1 through 106 of the Verified Complaint as if fully set forth herein.

108.     PWA's information regarding its clients and prospective clients, including client files, client lists, client's assets under management, client contact information, client portfolio data and history, key contacts, business and marketing plans and strategies, profit margins, investment vehicles, investment strategies, risk tolerances, products, fees and pricing are the backbone of PWA's business, all of which Miller and McCurry had access to and knowledge of by virtue of their employment relationships with PWA.  PWA's Confidential Information and Trade Secrets constitute trade secrets under the Defend Trade Secrets Act.

109.     Disclosure and unauthorized use of this type of information undermines PWA's competitive position in the highly competitive wealth management industry.

110.     PWA has taken various steps to protect its trade secrets, including (a) using network firewalls, password protection and security credentials to prevent unauthorized access to PWA's servers; (b) limiting its employee's access to information to that which is necessary to fulfill their job functions; (c) controlling physical access to PWA's offices and information; and

(d) requiring employees with access to its trade secrets to sign restrictive covenants, including nondisclosure, nonsolicitation and/or noncompetition agreements.

111.     Miller and McCurry have improperly and without authorization misappropriated, retained, used, disclosed and/or exploited PWA's trade secrets, including PWA's confidential client information, for the purposes of soliciting clients to transfer their accounts from PWA to Miller and McCurry on behalf of their new entity, Miller McCurry.  This conduct constitutes an actual and threatened misappropriation and misuse of PWA's trade secret information.

112.     Miller and McCurry continue to and will continue to improperly and without authorization misappropriate, retain, use, disclose and/or exploit PWA's trade secrets, including PWA's confidential client information, for the purposes of soliciting clients to transfer their accounts from PWA to Miller and McCurry on behalf their new entity, Miller McCurry.  This conduct constitutes an actual and threatened misappropriation and misuse of PWA's trade secrets.

113.     PWA did not expressly or impliedly consent to Defendants' acquisition or use of its trade secrets.

114.     Upon information and belief, Defendants' misappropriation was willful and malicious.

115.     Upon information and belief, Defendants' misappropriation of PWA's trade secrets is causing and will continue to cause PWA to suffer irreparable harm, for which it has no adequate remedy at law, and has damaged PWA in an amount to be determined at trial..

116.     The threatened and actual injuries that PWA has suffered and will suffer are immediate and irreparable.  Because of the difficulty in quantifying injury and harm to PWA's ability to compete, acquire and maintain a competitive advantage through its Confidential

Information and Trade Secrets, monetary damages alone will not adequately compensate PWA for the Defendants' wrongful use of such information and breach of their duties to PWA.  PWA, therefore, lacks an adequate and complete remedy at law and an equitable remedy is appropriate in addition to monetary damages.

117.     Under Section 1836 of the Defend Trade Secrets Act, PWA is entitled to injunctive relief, compensatory damages, exemplary damages, an award of reasonable attorneys' fees, and/or other appropriate relief.

**COUNT II**
**BREACH OF CONTRACT**
**(PWA v. Miller)**

118.     PWA incorporates by reference Paragraphs 1 through 117 of the Verified Complaint as if fully set forth herein.

119.     Under Miller's Non-Compete, Miller agreed that he would not "directly or indirectly engage in any business or in any activity competitive with or adverse to the business, practice or affairs of [PWA] during the twenty four (24) month period following termination and within twenty (20) miles of any office of [PWA], without [PWA]'s express written consent" ("Miller's Non-Compete"). Ex. A, Section 16.

120.     The terms of Miller's Non-Compete are reasonable in their scope and are necessary to protect PWA's legitimate business interests.

121.     Miller breached the Non-Compete by co-founding Miller McMurry – a direct competitor – and actively and directly competing with PWA and soliciting PWA's clients.

122.     As a proximate result of Miller's actions, PWA has suffered and will continue to suffer harm which cannot be adequately compensated by monetary damages alone.

123.     With full knowledge of his post-employment obligations to PWA, Miller is in breach of the Non-Compete.

## COUNT III
## BREACH OF CONTRACT
### (PWA v. McCurry)

124.     PWA incorporates by reference Paragraphs 1 through 123 of the Verified

Complaint as if fully set forth herein.

125.     In his Employment Agreement, McCurry agreed as follows:

I agree not to directly or indirectly solicit, for the purpose of offering or
attempting to offer any service, product or other application which is the same or
similar to the services, products or other applications offered by the Company or
in the process of being developed by the Company within the last year prior to
termination of my employment with the Company, any of the Company's clients
for a period of two (2) years after termination of my employment with the
Company. I further agree, for a period of two (2) years after the termination of my
employment with the Company, that I will not directly or indirectly hire or
directly or indirectly solicit or attempt to solicit any employee of, consultant to,
the Company, which employee or consultant has been rendering services to the
Company at any time within the twelve (12) month period immediately preceding
the termination of my employment, to leave the employ of, or no longer render
service to or for the benefit of, the Company.

Ex. B, Section 6.

126.     McCurry also agreed that, during the term of his employment with the Company

and for a period of two (2) years thereafter, he would not:

c.      Provide services directly or indirectly to any client or
prospective client of [PWA];

d.      Anywhere within fifty (50) miles of any office of
[PWA], become an officer or director of, or
consultant to or be employed by, or otherwise render
services to or on behalf of, a Competing Business,
which is defined to include any person, corporation,
partnership, joint venture, association, or other entity
engaged in the business:

(i)     Financial investment management;

(ii)    Real estate development; or

(iii)   Offering or attempting to offer any service,
product or other application which is the same

> as or similar to the services, products or other applications offered or in the process of being developed by the Company within the last year prior to termination of my employment Company.

127.     The terms of McCurry's Employment Agreement are reasonable in their scope and are necessary to protect PWA's legitimate business interests.

128.     McCurry breached the Non-Solicit by, among other things, soliciting PWA's clients and soliciting Miller to end his employment with PWA and go to work for Miller McCurry.

129.     McCurry breached the Non-Compete by co-founding Miller McCurry – a direct competitor – and actively and directly competing with PWA and soliciting PWA's clients.

130.     As a proximate result of McCurry's actions, PWA has suffered and will continue to suffer harm which cannot be adequately compensated by monetary damages alone.

131.     With full knowledge of his post-employment obligations to PWA, McCurry is in breach of the Non-Solicit and Non-Compete.

### COUNT IV
### TORTIOUS INTERFERENCE WITH CONTRACT
### (PWA v. All Defendants)

132.     PWA incorporates by references Paragraph 1 through 131 of the Verified Complaint as if set forth fully herein.

133.     Miller executed a valid and enforceable Employment Agreement with PWA.

134.     McCurry executed a valid and enforceable Employment Agreement with PWA.

135.     Miller knew of McCurry's contractual obligations to PWA and vice-versa.

136.     Miller McCurry, through its members, was aware of Miller's and McCurry's contractual obligations to PWA.

137.     Miller knowingly, intentionally, unjustifiably and in bad faith induced McCurry to breach his Employment Agreement with PWA by (a) devising a plan whereby McCurry and Miller would resign their employment with PWA using identical resignation letters; (b) going to work for Miller McCurry, a competing business they had set up during their employment with PWA; and (c) soliciting PWA's clients in violation of their contractual and legal obligations to PWA.

138.     McCurry knowingly, intentionally, unjustifiably and in bad faith induced Miller to breach his Employment Agreement with PWA by (a) devising a plan whereby McCurry and Miller would resign their employment with PWA using identical resignation letters; (b) going to work for Miller McCurry, a competing business they had set up during their employment with PWA; and (c) soliciting PWA's clients in violation of their contractual and legal obligations to PWA.

139.     Miller McCurry, through its members, knowingly, intentionally, unjustifiably and in bad faith induced Miller and McCurry to breach their Employment Agreements with PWA.

140.     As described herein, Defendants have interfered with Miller's and McCurry's respective contractual obligations to PWA.

141.     Defendants' conduct was not privileged.

142.     Defendants' interference with Miller's and McCurry's contractual obligations to PWA is causing and will continue to cause PWA to suffer irreparable harm and damages.

### COUNT V
### BREACH OF FIDUCIARY DUTY
### (PWA v. Miller and McCurry)

143.     PWA incorporates by reference Paragraphs 1 through 142 of the Verified Complaint as if fully set forth herein.

144.    An employee has a fiduciary duty of loyalty to provide services to his employer in accordance with his employment contract. *See B.G. Balmer & Co. v. Frank Crystal & Co.*, 2016 Pa. Super. LEXIS 516 (Pa. Super. Ct. Sept. 9, 2016); *Reading Radio, Inc. v. Fink*, 833 A.2d 199 (Pa. Super. 2003).

145.    Further, an employee has a duty to "act with the utmost good faith in the furtherance and advancement of the interests of his" employer. *Sylvester v. Beck*, 178 A.2d 755, 757 (Pa. 1962).

146.    An employee's duty of loyalty includes "a duty not to act or to agree to act during the period of his [employment] for persons whose interests conflict with those of the [employer] in matters in which the [employee] is employed." Restatement (Second) of Agency, § 394.

147.     "[A]n employee who expects to terminate his employment. . . may not. . . before the termination of his employment, solicit customers for [a] rival business, nor may he do other similar acts in direct competition with the employer's business." *Colonell v. Goodman*, 78 F. Supp. 845, 847 (E.D. Pa. 1948) (citing *Restatement of Agency*, § 393(e)); s*ee also Restatement (Second) of Agency*, § 393 ("Unless otherwise agreed, an agent is subject to a duty not to compete with the principal concerning the subject matter of his agency."); *Restatement (Second) of Agency*, § 393, comment (e) (agent "is not, however, entitled to solicit customers for such rival business before the end of his employment nor can he properly do other similar acts in direct competition with the employer's business").

148.    Miller and McCurry owed a duty of loyalty to PWA based on their employment and under their respective Employment Agreements.

149.    As stated in detail herein, Miller and McCurry breached the duty of loyalty owed to PWA when, prior to their resignations and while being paid by PWA, they had set up Miller

McCurry as a legal entity, leased office space less than a mile away from their PWA Pittsburgh office, sought legal advice on how to get out of or around their contractual obligations to PWA, had legal documents drafted to propose an asset purchase to PWA, sought the services of a computer forensic vendor for consultation related to their electronic activities, gathered the addresses and other information of the PWA clients they serviced so that they could mail them their solicitation, set up email accounts for Miller McCurry and met with key clients to advise them of their impending departure.

150.     Miller and McCurry further breached their duty of loyalty to PWA when they solicited PWA's clients on behalf of Miller McCurry prior to their resignations.

151.     As a direct result of Miller and McCurry's intentional and egregious breaches of their obligations to PWA, PWA has been damaged and will continue to be damaged.

## COUNT VI
## CIVIL CONSPIRACY
### (PWA v. All Defendants)

152.     PWA incorporates by reference Paragraphs 1 through 151 of the Verified Complaint as if fully set forth herein.

153.     By engaging in the acts set forth above, Defendants conspired to knowingly, willfully and purposefully commit illegal acts designed to unfairly compete with PWA, misappropriate PWA's Confidential Information and Trade Secrets to solicit PWA clients in violation of Miller and McCurry's contractual obligations to PWA.

154.     Upon information and belief, Defendants agreed, combined and acted with a common plan to breach the contractual and common law duties owed to PWA by engaging in the unlawful acts described above.

155.     Defendants further conspired to do so with the specific intent to injure NWMP's business.

156.    Defendants' actions have been willful and outrageous and undertaken with reckless indifference to PWA's rights.

157.    As a direct and proximate result of the acts done in furtherance of the conspiracy, PWA has been damaged, including damage in the form of expenses related to investigative and remedial actions taken to address the effects of the conspiracy.  PWA has suffered, and will continue to suffer, these injuries.

158.    The threatened and actual injuries that PWA has suffered and will suffer are immediate and irreparable.  Because of the difficulty in quantifying injury and harm to PWA's ability to compete, acquire and maintain a competitive advantage through its Confidential Information and Trade Secrets, monetary damages alone will not adequately compensate PWA for Defendants' wrongful use of such information and their breach of their duties to PWA. PWA, therefore, lacks an adequate and complete remedy at law and an equitable remedy is appropriate in addition to monetary damages.

**COUNT VII**
**UNJUST ENRICHMENT**
**(PWA v. All Defendants)**

159.    PWA incorporates by reference Paragraphs 1 through 158 of the Verified Complaint as if fully set forth herein.

160.    While employed by PWA and receiving the compensation associated with such employment, Miller and McCurry knowingly, willfully and purposefully committed illegal acts designed to unfairly compete with PWA, misappropriate PWA's Confidential Information and Trade Secrets for the benefit of PWA's direct competitor Miller McCurry.

161.    Because of these actions, Miller and McCurry are obligated to reimburse PWA for all compensation and benefits paid to them since April 30, 2019.

## COUNT VIII
## UNFAIR COMPETITION
### (PWA v. All Defendants)

162.    PWA incorporates by reference Paragraphs 1 through 161 of the Verified

Complaint as if fully set forth herein.

163.    Defendants, by engaging in the conduct described above, have engaged in unfair

competition with PWA.

164.    Defendants' conduct has caused and will continue to cause damage to PWA's

business relationships with its clients and other valuable business interests.

165.    Defendants' conduct has been and continues to be willful, intentional and

unprivileged and has caused and will continue to cause PWA to suffer immediate, irreparable

harm, as well as other compensatory damages.

166.    Defendants' conduct, as described above, is contrary to honest industrial and

commercial practices.

### **PRAYER FOR RELIEF**

WHEREFORE, PWA respectfully requests that this Court:

(a)    Award immediate and then permanent injunctive relief to PWA in the form of

enforcement of the restriction on competition to which Miller agreed during his employment

with PWA, tolled during his period of noncompliance;

(b)    Award immediate and then permanent injunctive relief to PWA in the form of

enforcement of the restriction on competition and solicitation of PWA's clients and employees to

which McCurry agreed during his employment with PWA, tolled during her period of

noncompliance;

(c)     Award actual and compensatory damages to PWA as shall be determined at trial

for injuries and damages which PWA has sustained in consequence of Defendants' wrongful

conduct;

(d)     Award liquidated damages in an amount equal to $2,250,000 against Miller

pursuant to the terms of his Employment Agreement with PWA;

(e)     Award punitive damages for Defendants' willful, wanton and malicious conduct;

(f)     Award costs, expenses and legal fees incurred by PWA in bringing this lawsuit to

enforce its contractual rights; and

(g)     Award such other relief as the Court deems to be just and proper.

Dated:  September 18, 2019                 Respectfully submitted,

                                           */s/ Erin McLaughlin*_____
                                           Erin J. McLaughlin *(PA 202044)*
                                           erin.mclaughlin@bipc.com
                                           BUCHANAN INGERSOLL & ROONEY PC
                                           One Oxford Centre, 20th Floor
                                           301 Grant Street
                                           Pittsburgh, PA  15219
                                           Phone:  412-562-8800
                                           Fax:  412-562-1041

                                           *Attorneys for Plaintiff*